**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JEROME CHANCELLOR, et al.,

               Plaintiffs,

        v.                               Case No. C-1-08-65

COCA-COLA ENTERPRISES, INC.,

               Defendant.

## O R D E R

This matter is before the Court upon the Motion for Summary Judgment as to the Claims of Plaintiff Maodo Dieng ("Dieng") filed by defendant Coca-Cola Enterprises, Inc. ("CCE") (doc. 167), plaintiffs' combined opposing memorandum (doc. 188), and CCE's reply in support of its motion (doc. 306).  The parties have highlighted as true, false or irrelevant the opposing side's proposed findings of fact and conclusions of law filed in connection with CCE's motion (docs. 168, 307).

### I.  Allegations of the Complaint

Plaintiff Dieng is an employee of CCE who has worked at the company's Duck Creek Road facility in Cincinnati, Ohio ("Duck Creek") from July 2001 until the present time.  He began his employment in the Production Department, where he worked primarily in Line Cleanup.  Dieng subsequently worked for a period of several months in the warehouse as a stock replenisher.  From January 2004 until the present, he has worked as a Forklift Operator in the warehouse.

Dieng filed this lawsuit against CCE under 42 U.S.C. § 1981 and the Ohio Civil Rights

Act ("OCRA") on January 25, 2008. He claims that he has experienced a racially hostile work environment throughout his employment with CCE, "which has included being subjected to daily harassment from Caucasian co-workers and disparate treatment by supervisors and managers." Doc. 1, ¶ 21. Dieng claims that he complained about the racially hostile work environment and is aware of other employees who did the same, but he continues to be subjected to a "hostile, intimidating, offensive, and abusive workplace." *Id*. Specifically, Dieng alleges that he has been subjected to the following incidents of harassment by co-workers and supervisors at CCE:

- Some time in late 2007 or during 2008, Dieng heard from co-worker Lonnie Waters, who in turn had heard from co-worker Mark Noble, that co-worker Tony Cruz had stated to a white female employee who was being trained by African-American employee Trevor Young, "Do not listen to these niggers." Dieng heard a rumor that Cruz, a third-shift pallet builder in the warehouse, was terminated for making the comment. Dieng 8/08 depo., pp. 11-15.

- When Dieng worked in Line Cleanup, supervisor John Morgan let Dieng's Caucasian co-worker Duane Boucher get coffee and the machine to which Boucher was assigned broke down or something occurred. Dieng 5/05 depo., pp. 29-30.

- When co-worker Ron Monday was assigned to a certain machine, he threw the material that clogged the machine out of the way instead of putting it close to him, thereby creating more work for Line Cleanup. Plaintiff told his supervisor Morgan about the issue so that Monday could make the job easier and so they could salvage some of the product. Dieng 5/05 depo., pp. 39-40.

- African-American Curtis Bell counseled Dieng and directed him to be drug-tested following an accident where Dieng drove a forklift into a parked truck, despite the fact that Dieng had told Bell prior to the accident that there was a problem with the forklift. Dieng 11/06 depo., pp. 59-62.

- Multiple Caucasian employees repeatedly laughed at Dieng because of his accent and mocked his speech when he was using the walkie-talkie radio, and they made no effort to understand him. Dieng 5/05 depo., pp. 26-28.

- Certain of Dieng's co-workers, specifically Monday, Chad Dummit and Boucher, tell him how to perform his job and "act as if they own the place." They try to delegate work

2

to him although they are not his supervisors, but Dieng is under no obligation to do what they say and does not listen to what they say.  Dieng 05/05 depo., pp. 42-45.

- Dieng's co-worker Dave Hall cursed at him on two occasions.  On one occasion around September 2006, Hall took Dieng's forklift and when Dieng came to ask about it, Hall said to him, "Mother fucker, seem like you own the forklift."  Another time, Hall called Dieng a "mother fucker" when the forklifts they were operating almost collided.  Dieng reported this incident to supervisor John Edwards, who talked to Hall with the union steward.  Hall has not cursed at Dieng since then.  Dieng 11/06 depo., pp. 30-37.

- Dieng's supervisor,  Morgan, and other supervisors repeatedly separated Dieng and idle African-Americans and admonished them to get back to work when the machines were inoperable.  In contrast, Caucasian employees, including Boucher, Monday, Charlie Hatfield, and Hall, were permitted to sit idle with no supervisor admonishing them if they were waiting for work to do. Dieng 5/05 depo., pp. 14-16, 23-25; Dieng 8/08 depo., pp. 19, 21.  Dieng observed Hall, a pallet builder, drinking pop and talking with some of his buddies in the middle of the job, but to plaintiff's knowledge, Hall has not been disciplined for failing to meet the pallet builder productivity standard.  Dieng 5/05 depo., pp. 24-25.

- Dieng's duties were made more difficult by co-worker Hall constantly stopping to drink a pop or talk with his buddies in the middle of a task.  Dieng 11/06 depo., pp. 18, 24.

- Dieng heard about graffiti in either the production or warehouse bathrooms but he never saw it himself and he does not remember who he heard about it from.  Dieng 11/06 depo., pp. 70-71.

- Mark Beske, a Caucasian, repeatedly reacted angrily when Dieng had to use the radio to ask for product, whereas when Caucasians Edwards or Bryon Jones call him on the radio, he does not react that way.  When Dieng complained to his supervisor about this on one occasion, the supervisor talked to Beske but the conduct continued.  Dieng 11/06 depo., pp. 46-48,

- Dummit, who worked with Dieng in the warehouse, constantly refused to assist Dieng with his duties after Dummit was finished with his own duties.  Sometimes Dummit would sit around and tell Dieng he had trucks on the way when Dummit was also allegedly responsible for unloading the trucks.  Also, Dummit repeatedly waited for Dieng to arrive before Dummit started working with the forklift even though Dieng did not need to be there for Dummit to start.  Dieng 5/05 depo., pp. 18, 32, 34; Dieng 11/06 depo., pp. 17-20, 23; Dieng 8/08 depo., p. 27.

- In October 2005, Dieng requested to have lunch from 7:00 to 7:30 so that he could observe the daytime fast for Ramadan.  Supervisor Edwards and Garry McGuire from Human Resources refused the request without explanation.  A week later, Edwards asked

Dieng to take on some duties that pushed Dieng's lunch back half an hour to the requested time. Dieng 11/06 depo., pp. 38-42.

- Supervisor Mark Osborne watched over Dieng differently than he watched over Caucasians. Dieng heard from African-American co-workers Lonnie Waters and Mike Paddy that Osborne watched them closely. When Dieng questioned Osborne about watching him, Osborne responded by laughing and telling him to just do his job. Dieng 8/08 depo., pp. 28-34.

## II. CCE's Motion for Summary Judgment

CCE argues that Dieng's allegations do not suffice to establish a hostile environment because Dieng cannot show severe or pervasive harassment in that he has alleged only one clearly racial statement, which he heard about fourth-hand and which resulted in the termination of the perpetrator, Tony Cruz; the remainder of the incidents about which Dieng complains are isolated, discrete events occurring over the course of his employment which he cannot show to be harassment based on his race; Dieng's allegations do not rise to the level of extreme conduct as required to state a claim for a racially hostile work environment; there is no evidence that the harassment made it difficult for Dieng to do his job; and Dieng cannot establish a basis for employer liability because he admittedly failed to report the bulk of his allegations to CCE management and the one incident he did report, which was Hall cursing at him, led to Hall being punished and never repeating the conduct. CCE contends that the types of incidents about which Dieng complains constitute "simple teasing" at best or the kinds of everyday frictions and disappointments that all workers face in the workplace. CCE asserts there is nothing inherently "racial" about these incidents, and the simple fact that plaintiff is black and the alleged harassers are Caucasian is insufficient to support a racially hostile work environment claim.

## III. Applicable Law

## A. Actionable Hostile Environment

4

Discrimination claims under the OCRA and § 1981 are generally governed by the same evidentiary standards as discrimination claims under Title VII. *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164, 1167 (1991); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 561 (6th Cir. 2004); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). The Court will therefore look to both Title VII case law and Ohio law in order to resolve the motion for summary judgment on plaintiff's claims.

An employee may establish a violation of Title VII by proving that discrimination based on his membership in a protected group has created a hostile or abusive work environment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986). In order for racial harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id*. at 67. "The theory of a hostile-environment claim is that the cumulative effect of ongoing harassment is abusive." *Hafford v. Seidner,* 183 F.3d 506, 514-515 (6th Cir. 1999).

To establish a prima facie hostile environment case based on race under Title VII, the plaintiff must establish that (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his race, (4) the harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive, or intimidating work environment, and (5) there is employer liability. *Id*. at 512.

To satisfy the fourth prong, plaintiff must show that the conduct to which he was subjected was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that he subjectively regarded the conduct as abusive. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp.,* 191 F.3d

647, 658-59 (6th Cir. 1999)).  In determining whether a reasonable person would consider an environment hostile or abusive, a court must consider the totality of the circumstances, including the frequency and severity of the conduct and whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. ***Hafford,*** 183 F.3d at 512.

A hostile environment claim "cannot be said to occur on any particular day." ***Clay v. United Parcel Service, Inc***., 501 F.3d 695, 708 (6th Cir. 2007) (citing ***Ledbetter v. Goodyear Tire & Rubber Co***., 550 U.S. 618 (2007) (quoting ***Morgan***, 536 U.S. 101, 115-16 (2002)). Rather, a hostile work environment is comprised of "a succession of harassing acts, each of which 'may not be actionable on its own.'" ***Id.***  "[T]he actionable wrong is the environment, not the individual acts that, taken together, create the environment." ***Id***.  Therefore, the court "should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." ***Quanex***, 191 F.3d at 660 (citations omitted).  On the other hand, a discrete act is not actionable as a hostile environment.  ***Clay***, 501 F.3d at 707-08.

Mere offensive utterances are not sufficient to create an actionable hostile environment. ***Id***.  However, the use of the word "nigger," even taken in isolation, is not a "mere offensive utterance." ***Johnson v. United Parcel Service, Inc***.  117 Fed. Appx. 444, 454  (6th Cir. 2004). Moreover, "[a]n abundance of racial epithets and racially offensive graffiti" may constitute severe and pervasive harassment.  ***Quanex***, 191 F.3d at 662.

An action that is not explicitly racial in nature may constitute proof of a hostile work environment if it would not have occurred but for the plaintiff's race.  ***Id***.; ***see also Williams v. General Motors Corp***., 187 F.3d 553, 565-66 (6th Cir. 1999) (conduct underlying a sexual

harassment claim need not be overtly sexual in nature.)  In ***Williams***, the Sixth Circuit determined that "[t]he myriad instances in which [the plaintiff] was ostracized, when others were not, combined with the gender-specific epithets used, such as 'slut' and 'fucking women,'" were sufficient to create an inference that the plaintiff's gender was the motivation for her co-workers' conduct.  ***Id***.

Discriminatory conduct and comments need not be directed at the plaintiff in order to contribute to a hostile environment.  ***See Quanex***, 191 F.3d at 660 (citing ***Black***, 104 F.3d at 826).  Rather, the plaintiff may be subjected to a hostile environment when the employer directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff himself.  ***Id***.  The Sixth Circuit in ***Quanex*** explained that to consider harassment directed solely at the plaintiff in isolation from other acts that occur in the workplace would defeat the entire purpose of allowing claims based upon a hostile work environment theory because the "environment" means "[t]he surrounding conditions, influences or forces which influence or modify." ***Id***. at 661 (quoting Black's Law Dictionary 534 (6th ed. 1990)).  The Sixth Circuit further explained that comments which disparage members of a protected class are relevant not only to whether a work environment was objectively hostile, but also to whether the plaintiff subjectively felt harassed.  ***Id***.

Nonetheless, a plaintiff's knowledge of acts of harassment directed against other employees is not necessarily sufficient to establish a hostile work environment.  ***Hawkins v. Anheuser-Busch, Inc***., 517 F.3d 321, 336 (6th Cir. 2008).  When the plaintiff alleges similar acts of past harassment against other employees, the factfinder may consider the following factors in determining the relative weight to give the past acts: "the severity and prevalence of

the similar acts of harassment, whether the similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff." **Id**. The proximity of the acts of harassment is to be weighed in accordance with the principle that the "further back in time the prior act occurred . . . the weaker the inference that the act bears a relationship to the current working environment." **Id**. at 337. When a "serial harasser" is involved, more weight should be given to the acts of harassment if the plaintiff knows that individual committed offending acts in the past since "a serial harrasser left free to harass again leaves the impression that acts of harassment are tolerated at the workplace . . ." **Id**.

The trier-of-fact may credit evidence that a plaintiff learned second-hand that another employee in the protected group was harassed by a co-worker or supervisor. **See Quanex**, 191 F.3d at 660; **Wanchik v. Great Lakes Health Plan, Inc**., 6 Fed.Appx. 252, 261-262 (6th Cir. 2001). In order for incidents directed at other employees which occurred outside of the plaintiff's presence to be relevant to a plaintiff's own claim of harassment, the plaintiff must have become aware of those incidents during the course of his employment. **See Wanchik**, 6 Fed.Appx. at 261-262; **Hawkins**, 517 F.3d at 336.

**B. Employer Liability**

Employer liability for co-worker harassment is based directly on the employer's conduct. *Hafford,* 183 F.3d at 513 (citing *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 n. 11 (6th Cir. 1994)). An employer is liable if it "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Id*. If the employer has developed a response to a complaint of co-worker harassment, the employer will be liable only "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *McCombs v. Meijer, Inc*., 395 F.3d 346, 353 (6th Cir. 2005) (citing *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)).[1] In such a case, the employer's discriminatory act is not the harassment but is "the inappropriate response to the charges of harassment." *Id*.

The appropriateness of the employer's response depends on the frequency and the severity of the harassment. *Blankenship*, 123 F.3d at 872. Generally, the employer's response is adequate if it is reasonably calculated to end the harassment. *Jackson,* 191 F.3d at 663 (citation omitted). The employer's actions will not necessarily shield it from liability if the

---

[1]*In Collette v. Stein-Mart, Inc*., 126 Fed.Appx. 678, 684 (6th Cir. 2005), the Sixth Circuit called the continued viability of *Blankenship* into question insofar as *Blankenship* held that "mere negligence as to the content of the response cannot be enough to make the employer liable. When an employer responds with good faith remedial action . . . it can be liable for [race] discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." The Sixth Circuit in *Collette* stated that an employer may be held liable when its remedial response is "merely negligent, however well-intentioned." *Id*. at 684, n. 3. More recently, however, in *Mullins v. Goodyear Tire & Rubber Co*., 291 Fed. Appx. 744, 748 (6th Cir. 2008), the Sixth Circuit stated that its decision in *Hawkins,* 517 F.3d at 339, "removed any doubt that the *Blankenship* standard survives" and that *Blankenship* remains good law for the proposition that an employer may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

harassment continues.  *Id*. at 665 (citation omitted).

It is not necessary that racially harassing conduct be reported to the employer in order for a cause of action to lie.  *Id*. at 663.  Rather, it is only necessary that the plaintiff establish that the employer "knew or should have known" of the harassing conduct.  *Id*.

Employer liability for supervisor harassment is vicarious. *Hafford,* 183 F.3d at 513 (citing *Pierce*, 40 F.3d at 803).  "An employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Id*. (citing *Faragher  v. Boca Raton,* 524 U.S. 775, 807 (1998)). An employer may raise an affirmative defense to liability comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (quoting *Faragher,* 524 U.S. at 807).  If the employer shows that an employee unreasonably failed to use any complaint procedure that the employer provided, such showing will ordinarily satisfy the employer's burden under the second element of the defense.  *Faragher,* 524 U.S. at 808.

Under the first prong of the defense, employers "have an affirmative duty to prevent . . . harassment by supervisors."  *Clark*, 400 F.3d at 349 (citing *Williams*, 187 F.3d at 561). "[A]n employer may not stand by and allow an employee to be subjected to a course of racial . . . harassment by co-workers or supervisors."  *Id*.  Rather, once an employer has learned of the harassment, the employer has a legal duty to take reasonable steps to eliminate it." *Id*. (citing *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997) (internal quotation marks and citations

omitted)). Thus, regardless of whether the employee complained, the employer can be held vicariously liable if it was aware of the harassment but did nothing to correct it or prevent it from recurring. *Id*. (citing *Perry v. Harris Chernin, Inc*., 126 F.3d 1010, 1014 (7th Cir. 1997)).

While the affirmative duty on the part of the employer will often include the requirement that it have some type of anti-harassment policy in place, the law imposes a greater obligation than this on the employer. *Id*. The first prong of the affirmative defense requires the court to look beyond the face of the employer's policy to determine whether the policy "was effective in practice in reasonably preventing and correcting any harassing behavior." *Id*. (citing *Faragher*, 524 U.S. at 806).

## C. Cases Where Conduct Held Not to be Sufficiently Severe or Pervasive

The question of whether conduct is severe and pervasive is "quintessentially a question of fact." *Clay*, 501 F.3d at 707 (citing *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)). The Sixth Circuit has nonetheless affirmed grants of summary judgment and determined in a number of cases that the conduct complained of was not sufficiently severe or pervasive as a matter of law In *Clay*, the Sixth Circuit upheld the district court's determination that the harassment complained of by the plaintiff, which totaled 15 specific incidents over a two-year period, "did not rise to the level of severity or pervasiveness that would unreasonably interfere with her ability to work." 501 F.3d at 707. The court of appeals found instead that the incidents were for the most part "mere offensive utterances," which are not actionable under Title VII. *Id*. (citing *Harris*, 510 U.S. at 21). The court compared *Jordan*, 464 F.3d at 598, where the court deemed sufficiently severe and pervasive a ten-year course of conduct consisting of racial slurs, demeaning jokes, inflammatory graffiti, isolation and segregation, disparate discipline, and the

imposition of additional duties, with *Burnett*, 203 F.3d at 984-85, where the court determined that three sexually offensive remarks made by the plaintiff's supervisor at the beginning and end of a six-month period did not constitute pervasive discriminatory conduct. *Id*.

In a number of other cases, the Sixth Circuit has upheld determinations by the district court that the conduct alleged by the plaintiff did not rise to the level of "severe and pervasive." These cases include *Bowman v. Shawnee State Univ*., 220 F.3d 456 (6th Cir. 2000), in which the court held that three of five alleged incidents, though "not merely crude, offensive, and humiliating, but also contain[ing] an element of physical invasion" were not sufficient to meet the severe or pervasive standard; *Burnett v. Tyco Corp*., 203 F.3d 980, 985 (6th Cir. 2000), where the court held that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period [did] not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment;" *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000), where the court held that simple teasing, offhand comments, and isolated incidents, including a sexual advance, did not amount to discriminatory changes in the terms and conditions of the plaintiff's employment; *Dotson v. Norfolk Southern R.R. Co.*, 52 Fed.Appx. 655, 659 (6th Cir. 2002), where the court held that the following alleged conduct did not rise to the type regarded by the Sixth Circuit as severe or hostile: a coworker persistently used the initials "KKK" instead of his own initials on work documents, which ceased once management was made aware the conduct; a coworker used the term "ungawa" from the Tarzan movies as a salutation, which the court found difficult to attribute to a racial motive; other coworkers called the plaintiff names such as "tar baby" and treated her harshly, which the court noted were allegations the plaintiff could support only in

very general terms; management continued to use a janitorial service that employed a worker who allegedly harassed the plaintiff by mopping over her feet and bumping into her; and plaintiff alleged that she was subjected to disparate discipline, she was not allowed to sit at the front desk, and she was not promoted based on her race; *Leggett Wire,* 220 F.3d at 760, where the court held that "[r]acial animus [could not] be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at [the plaintiff], over a twenty-year span of time" and, specifically, that "a racial slur in 1974 by an unknown coworker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in [the plaintiff's] termination decision, [a coworker's] racist joke sometime after 1993, and [a] supervisor['s] reference to a black employee as a 'gorilla' [were] simply not 'severe or pervasive enough' to create an objectively hostile work environment."

Another case where the Sixth Circuit held that the plaintiff had failed to establish a hostile work environment is *Bourini v. Bridgestone/Firestone North American Tire, LLC*, 136 Fed.Appx. 747, 751 (6th Cir. 2005). In *Bourini*, the court distinguished *Quanex*, 191 F.3d at 662, and held that eight alleged incidents over a five-year period were insufficient to constitute discriminatory changes in the terms and conditions of employment. Rather, while several of the incidents were offensive and highly inappropriate, they were relatively infrequent and isolated and collectively did not arise to the "threatening" or "humiliating" level of severe conduct required to create an objectively hostile or abusive work environment under Title VII. The alleged incidents were as follows: Within the first few months of his employment in 1998, a co-worker told Bourini, a Muslim from the country of Jordan, that he "did not want to go outside and see Bourini's camel tied to [his] wheels;" in 1999, another coworker called Bourini a "camel

jockey;" approximately two years later, soon after the September 11 attacks, a coworker attempted to back over Bourini while reversing a forklift truck, although an investigation by the company disclosed no basis on which to conclude the coworker had acted intentionally or with a discriminatory animus; another coworker allegedly stated he would put Bourini in a box and send him back to his country and the next day allegedly told Bourini, "[I]f you'd get the sand out of your ears you'll hear me better;" in March 2002, an unknown coworker apparently mocked Bourini's voice over the intercom system; in June 2002, Bourini witnessed slurs painted on the wall of one of the plant's restroom stalls where someone had written that the "I" in "Islam" stood for "idiots," the "s" for "shit bags," the "1" for "losers," the "a" for "assholes," and the "m" for "morons;" in 2002, Bourini found a pamphlet at his work station entitled "For my Muslim Friend," which Bourini apparently assumed was Christian proselytizing material; and in February 2003, an e-mail message was distributed to all employees at the plant advising them that some of them needed to visit the human resources department to receive information about a change in federal immigration laws, which disturbed Bourini because he felt that the message should have been directed to him privately.  *Id*. at 748-749.

The Sixth Circuit in ***Kelly v. Senior Centers,*** 169 Fed. Appx. 423 (6th Cir. 2006), likewise found that the Caucasian plaintiff who was employed at the defendant non-profit agency for seven months had failed to establish a hostile work environment when he alleged that he heard two staff members refer to African-American foster grandparents as "niggers;" he heard the Executive Director refer to an African-American member of the Board as a "token black" and comment that the foster grandparents were slovenly or "pigs" at meals; a staff member made three racist jokes; and the Executive Director refused to have the restrooms that were frequently

used by the foster grandparents cleaned regularly and complained when an African-American staff member used the bathroom which was also used by the administrative staff. In discounting the severity of the conduct, the court gave weight to the fact that none of these incidents involved any physical threat to plaintiff or the foster grandparents and none of the foster grandparents had ever heard, or been exposed to, any of the conduct. The court concluded,

> While we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of [plaintiff] was not a daily or even a weekly event.

*Id*. at 429. The court distinguished the case before it from ***Quanex,*** which it described as involving "evidence that supervisors routinely used the word 'nigger' and other racial slurs and gave out 'award' stickers for firing minority employees; workplace restrooms had graffiti stating 'KKK is back' and depicting lynchings; Caucasian workers falsely accused an African-American worker of stealing $300 in an attempt to get that worker fired; an African-American worker's shirt was defaced with the slur 'Nigger Sucker'; African-American workers were disproportionately disciplined by factory supervisors and were not promoted; and a Caucasian worker wore a swastika to work." *Id*. It also distinguished the case of ***Hafford v. Seidner***, 183 F.3d 506, where evidence that the plaintiff, a prison guard, was called racially derogatory names by several coworkers over a two and a half-year period; repeatedly received anonymous and very threatening phone calls over the prison's internal telephone system, including one call stating "you're dead" and one using a slang phrase that referred to race-related lynching; was asked by his superior officer if "he was scared to die;" and was subjected to other derogatory comments about being a "black Muslim," were sufficient to raise a jury question as to the existence of a racially discriminatory hostile work environment. *Id*. at 429-30. Finally, the Court

distinguished ***Pollard v. DuPont de Nemours, Inc***., 412 F.3d 657, 659-664 (6th Cir. 2005), "where a relentless, daily, consistent pattern of sexual harassment, including refusal to accept supervision from the plaintiff female supervisor, daily use of sexual slurs, altering machines to make plaintiff's job more difficult, and intentional 'dirty tricks' such as slashing tires and burning plaintiff's food" were held to be sufficient to support a jury verdict of a hostile work environment. ***Id***. at 430.

The court in ***Smith v. Glenny Glass Co., Inc.***, 2007 WL 1202713, **6-8 (S.D. Ohio April 20, 2007) (Dlott, J.) found that a total of seven instances of racially-oriented comments made by the president or other employees over an approximately five-year period, while "in incredibly poor taste and offensive," could not amount to severe or pervasive harassment under Sixth Circuit precedent. Rather, the court stated that precedent requires that an employee be subjected to more than sporadic, racially-charged comments, whereas the frequency of the discriminatory conduct alleged by the plaintiff before the court was sporadic, not routine. Specifically, the plaintiff alleged six discrete occasions on which a coworker or the company president made a racially offensive comment to him and he alleged that a coworker "consistently made racist statements concerning his gait;" there was no indication that any of the comments were made with hostility or suggested aggression or violence; and no comments involved the use of racial epithets. The court noted as examples of what is required for an employee to demonstrate a hostile or abusive work environment the incidents in ***Allen v. Mich. Dept. of Corrections***, 165 F.3d 405, 408-09 (6th Cir. 1999), where the plaintiff alleged he had been skipped over for promotions, he had received unwarranted disciplinary counseling notices, he had been told by a manager that "he was lazy like the rest of his people and that is why they are

all in prison," he had received a death threat signed "KKK" with a picture of a stick figure with a noose around its neck, and he had been transferred to an area where he could be watched closely after being told "niggers can't be trusted;"[2] the incidents in ***Moore v. Kuka Welding Sys***., 171 F.3d 1073 (6th Cir. 1999), where the plaintiff alleged he was subjected to a racially hostile work environment when he was subjected to frequent and numerous racial slurs and jokes, such as "hey nigger," and the supervisor failed to respond; someone wrote "kill all niggers" on the shop's bathroom wall and the supervisor failed to take action; a supervisor asked the plaintiff to drive a fellow employee, who was white, while the white employee sat in the back seat; and the plaintiff was subjected to more than a year's worth of supervisor-mandated, daily isolation from all other employees after he had filed a race discrimination complaint with the EEOC; and the incidents in ***Jordan v. City of Cleveland***, 464 F.3d 584 (6th Cir. 2006), where a city firefighter alleged being subjected to a plethora of racially offensive jokes and graffiti, derogatory comments, isolation, segregation, malicious pranks, disparate treatment, additional duties, and racially motivated transfers over a 15-year period.

## D.  Cases Where Conduct Held to be Sufficiently Severe and Pervasive

In addition to those cases cited in ***Glenny Glass,*** there are several cases where the Sixth Circuit has found the alleged conduct to be severe and pervasive.  In ***Johnson,*** 117 Fed.Appx. at 454-455, the court found that the severity of the discriminatory conduct was high, an environment of management hostility towards African-Americans had altered the conditions of employment, and the plaintiff's subjective feelings of hurt and loss of trust were objectively

---

[2]Additional allegations in ***Allen*** were a manager told Allen "I'm writing your black ass up" and the threatening letter signed "KKK" also stated "Pull bid-If not, you will be looking for a job or die. Nigger out."

reasonable where the plaintiff heard second-hand that his Division Manager had made racial comments and was a racist; plaintiff had overheard the Division Manager use the word "nigger" in a conversation with the union business manager, who told plaintiff when he approached him that the Division Manager mocked the way the African-Americans talked and acted; the Division Manager told plaintiff that he was "tired of African Americans complaining" after plaintiff had filed a grievance; a supervisor accused plaintiff of falsifying records and stealing company time; plaintiff was aware of an incident where a white employee hit a black employee in the face with a package while making racial comments and the white employee was treated leniently by the company; a supervisor told plaintiff that an individual who was going to ride with plaintiff one day was going to "haul" plaintiff around all day; and a supervisor attempted to discipline plaintiff for wearing his prescription sunglasses indoors and approached plaintiff for taking too long for his deliveries, even though plaintiff was ahead of his schedule at the time. The factors that weighed into the court's decision were that the use of the word "'nigger,' even taken in isolation, is not a 'mere offensive utterance;'" the fact that the Division Manager was the one who allegedly uttered the slur "nigger" greatly increased its severity; the supervisor's accusation that plaintiff stole time was severe because, if true, it was grounds for immediate termination; and it was significant that the Division Manager, who was an integral figure in the grievance process, had directed the racially derogatory comment at plaintiff that he was tired of African Americans complaining in the context of responding to a grievance plaintiff had filed. *Id*.

In *Austion v. Clarksville,* 244 Fed. Appx. 639 (6th Cir. 2007), the plaintiff, an African-American officer with the Clarksville Police Department, was aware than another officer displayed racist cartoons on the briefing table at the Clarksville police station shortly after he began his employment in 1991, although he did not personally view the cartoons; he learned

18

from other African-American officers in the department that an unidentified officer had hung a noose in a workstation at police headquarters for at least four months in 2001; in September 2001, he was denied a promotion, despite having achieved a passing score on the written test, "because of his lethargic work ethic, lack of self motivation, low production, and deficient paperwork;" in March 2002, he was denied a promotion, as a result of which he filed a charge with the Equal Employment Opportunity Commission ("EEOC"); in January 2003, a request by Austion's supervisor that he receive a written commendation was delayed, apparently because of Austion's EEOC charge, and a letter was circulated by an officer describing employees who had filed discrimination charges as "complainers" and "disgruntled employees;" in May 2003, because of EEOC complaints, the Chief asked Austion to remove a figurine of a tribesman on a motorcycle from his desk because he thought it would offend minorities, but the Chief did not comment on a muscular Caucasian policeman with a dog figurine Austion had on his desk; the Chief ranted at Austion in front of his entire command staff when Austion approached him regarding rumors of an investigation concerning Austion's alleged involvement in drugs and prostitution; in October 2003, Austion's on-call schedule was changed to more difficult hours; in 2004, Austion was ordered to relinquish his weapon for testing to determine his possible involvement in a drive-by shooting at a house owned by a Caucasian officer; and Austion testified that supervisory officers used racial slurs throughout the department, and specifically, the Chief used the word "nigger" to describe African-Americans in the department in the late 1980s; in 2003, a Caucasian officer referred to a detective as a "nigger" and a supervisory officer called a detective a "nigger," after he arrived late at the shooting range. The court determined that Austion's 2001 and 2002 failure to promote claims were time-barred under Title VII but that Austion nonetheless could rely on these past incidents to establish his hostile work environment

claim. The court found that the collective import of all the racial incidents provided adequate evidence for the jury to infer that a racially hostile work environment existed. The court, while acknowledging that the evidence of hostile work environment harassment was "somewhat meager," nonetheless was not convinced that a reasonable jury could not find that a hostile work environment existed. *Id*. at 652.

*Quanex*,191 F.3d at 650, involved a manufacturing plant in Michigan that, in accordance with an agreement the company had signed with the EEOC, had increased the number the African-American employees in the plant to 18 out of 349 total employees. The plaintiff alleged that throughout her employment with Quanex, she was the victim of a racially hostile work environment resulting from "numerous racist incidents which [she] witnessed, experienced, and learned about from the small group of African Americans with whom she worked." The plaintiff personally experienced frequent racial slurs, including the word "nigger," and heard of graffiti reading "KKK is back" and depicting lynchings,  regularly saw racist graffiti in the restroom and on a door in the plant that read "Blacks out back," had someone tamper with her equipment, was denied a helper for one year while similarly-situated employees were assigned a helper, and was disciplined and wrongfully denied overtime following an argument in which a co-worker called her a "nigger bitch." *Id*. at 651-52. The appellate court stated that an employer may create a hostile environment for an employee even when it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member rather than at just the plaintiff herself; the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment; and even if a certain action is not specifically racial in nature, it may contribute to a hostile work environment if it would not have occurred but for the fact that the plaintiff was African-American. *Id*. at 661-62. The appellate

court found that although Quanex occasionally responded to complaints of harassment, it was clear that "Quanex exhibited indifference rising to an attitude of permissiveness that amounted to discrimination." *Id*. at 666.

In *Robinson v. CCE, Inc*., 2007 WL 2948869, **8-9 (S.D. Ohio Oct. 9, 2007), Judge Beckwith of this court followed *Quanex* and determined that a reasonable jury could find that under the totality of the circumstances, each of the five plaintiffs employed by CCE at its Duck Creek and Wilmer Avenue facilities during or around the same time period at issue in this case was subject to a racially hostile environment for the following reasons:

- The use of racial epithets by CCE employees was a common occurrence and the plaintiffs either personally experienced this abuse or learned of such insults from other employees.

- Employees' references to African-American employees as "niggers," "monkeys," and "gorillas" should be given considerable weight, even if the racial insults were infrequent, since these comments go beyond mere offensive utterances and are severe, malicious, and repugnant. 2007 WL 2948869, * 8 (citing *Johnson,* 117 Fed. Appx. at 454 and cases from other circuits).

- Plaintiff Robinson (1) was subjected to slurs on a daily basis; (2) was the victim of a racially-motivated assault by a Caucasian co-worker and witnessed the assailant punch another African-American employee; and (3) testified that African-American employees were held to different work standards and that supervisors allowed Caucasian employees to loaf while African-American employees were ordered back to work (*see Clay*, 501 F.3d 695) (plaintiff demonstrated that harassment was based on race where supervisor criticized plaintiff for conduct for which white co-workers were not criticized).

- Plaintiff McCoy (1) was the victim of racial slurs; (2) observed that supervisors treated African-American employees differently from Caucasian employees with respect to idling on the work floor; (3) was the victim of pranks perpetrated by his supervisor which a reasonable juror could find were racially motivated; (4) gave testimony which suggested that some work areas seemed to be segregated by race (*See Jordan*, 464 F.3d at 597 (plaintiff experienced racially hostile environment where work shifts were racially segregated in part); and (5) was aware of racial graffiti and heard that managers and supervisors used racial slurs in meetings.

- Plaintiff Roe (1) witnessed supervisors treat African-American employees and Caucasian employees differently with respect to work assignments; (2) observed that African-American employees were disciplined more harshly than Caucasian employees with

regard to rules infractions; (3) was aware of racial slurs made by a supervisor and heard about and personally observed racial graffiti, some of which remained on the walls for months; and (4) heard that a racially-motivated poster was displayed at the back gate.

- Plaintiff Frost (1) saw supervisors treat African-American and Caucasian employees differently with respect to idle time and disciplinary actions; (2) heard about racial graffiti in the restroom, although he knew it had been removed; (3) was aware of the altercation between Robinson and the Caucasian co-worker; (4) was aware of racial comments made by a white employee to another African-American employee; (5) was the victim of an apparently racially-motivated assault by a co-worker and the victim of a prank by the same co-worker which one could conclude was conceivably racially motivated; (6) was physically threatened by another co-worker; and (7) was subject to racially derogatory remarks by other employees, who among other things called him a "gorilla."

- Plaintiff Thiam (1) testified that supervisors treated African-American employees more rudely than Caucasian employees; (2) testified that his supervisor called him a "lazy black bastard" and made a comment about the complexion of his skin; (3) was aware of racist graffiti, including "nigger" and "KKK" on the bathroom walls; and (4) had heard that a supervisor threatened retaliation against another African-American employee for complaining about discrimination.

The court found that there was a question of fact as to whether CCE's anti-discrimination policies are effective and whether CCE had acted promptly to correct harassing behavior. In so concluding, the court relied on an April 26, 1999 memorandum which Kevin Johnson, Human Resources Manager for CCE's Duck Creek and Wilmer Avenue facilities, had written to Thomasina Kennedy, who was CCE's Human Resources Director at the time. The court determined that the memorandum reflected that CCE was aware of racial animus within its organization, "that it was having difficulty coming to grips with racism among its employees and supervisors," and that it had not responded adequately to the problem in the past. The court determined that the memorandum

> demonstrates recognition by CCE that there was racial tension and disparate treatment of minority employees in its warehouse, supporting Plaintiffs' claims that they were forced to work in a racially hostile environment. Second, the memorandum implicitly recognizes that some of the supervisors about whom Plaintiffs now complain, specifically Carl North, Chuck Peasley, and Russ

22

> Lehman, were responsible for creating or contributing to the hostile work
> environment.

***Id***. at *11.

In addition, the court found that the plaintiffs had presented evidence that CCE's response to the harassment had been ineffectual; the mere existence of anti-discrimination policies did not conclusively establish that CCE had acted reasonably in remedying the harassment or preventing its recurrence; although CCE eventually took some steps to combat graffiti, such as laminating table tops and installing stainless steel bathroom stalls, a reasonable jury could find that these measures were slow in coming; and investigations into allegations of racial slurs simply resulted in denials by the accused employee with no further attempts by CCE to confirm or refute the charge. ***Id***. at **11-12. In response to CCE's argument that plaintiffs unreasonably failed to utilize the complaint procedures in place, the court found that plaintiffs had submitted ample evidence that the harassment was so severe and pervasive that CCE had constructive notice of it. ***Id***. at *14.

## IV. Analysis of Dieng's Claims

Upon careful review of the record, the Court finds that Dieng has failed to come forward with sufficient evidence to create a genuine issue of material fact as to whether he was subjected to a racially hostile work environment. The Court finds that Dieng has failed to proffer evidence to permit a reasonable jury to infer that there was a racial component to the vast majority of the incidents about which he complains. These incidents are the occasion when Morgan let Boucher get coffee; the incident where Monday threw the jamming product out of the way in such a way as to create more work for Line Cleanup; the incident where Bell counseled Dieng and directed him to be drug-tested following a forklift accident; the occasions where Dieng's Caucasian co-

workers have told him how to perform his job and have acted "as if they own the place;" the incidents where Hall cursed at plaintiff; the incidents where Hall stopped to chat, drink a pop or do nothing in the middle of a task, thereby making Dieng's job more difficult; the occasions where Dummit has refused to assist Dieng with his duties; and Edwards' initial refusal to push Dieng's lunch back 30 minutes to accommodate his request to observe the Ramadan fast. Dieng has provided no testimony or evidence whatsoever to suggest that his supervisors and co-workers engaged in the above conduct because Dieng is black so as to permit a reasonable trier-of-fact to infer that these incidents would not have occurred but for Dieng's race. In addition, Dieng failed to characterize as racial in nature the graffiti in the production or warehouse bathrooms which he heard about through other employees. Accordingly, even when considered in conjunction with the other conduct about which Dieng complains, these incidents cannot be deemed to have contributed to a racially hostile work environment for Dieng.

The incidents described by Dieng which he personally experienced and which a reasonable jury could find to be racially motivated were those where Beske, a Caucasian, repeatedly reacted angrily when Dieng had to use the radio to ask for product, but has not reacted that way when certain Caucasians call him on the radio; incidents where Dieng's supervisors separated Dieng and idle African-Americans and admonished them to get back to work but did not do the same for Caucasian employees; and Dieng's perception and that of certain African-American co-workers that supervisor Osborne watched over them more closely than he watched over Caucasians. For summary judgment purposes, the Court will assume that a reasonable jury could also find that Caucasian co-workers were racially-motivated when they laughed at Dieng because of his accent and mocked his speech when he was using the walkie-talkie radio, even

though these incidents cannot reasonably be characterized as anything more than inappropriate teasing. Taken together, the totality of the incidents plaintiff describes fall far short of "severe." They are neither hostile nor threatening. The incidents did not involve the use of racial slurs or jokes or even offensive language. There is no indication that the conduct unreasonably interfered with plaintiff's work performance. Thus, plaintiff was not subjected to a hostile environment at CCE as a result of conduct which he directly experienced.

The only racially-motivated incident that plaintiff learned about second-hand and which he has included as part of his case, which is the Tony Cruz slur he heard about from co-worker Lonnie Waters, adds almost nothing to his claim. While offensive comments need not be directed at the complaining individual in order to contribute to a hostile environment, second-hand information and rumors do not carry the same weight as do comments directed at an individual or that an individual overhears. In Dieng's particular case, the weight the slur carries is negligible because while highly offensive, it was an isolated incident for Dieng and it was Dieng's understanding that CCE terminated Cruz for making the comment.

In sum, the Court finds as a matter of law that Dieng has failed to come forward with evidence to demonstrate that he has been subjected to a racially hostile work environment during his eight years of employment at CCE. Dieng has failed to show that the conduct about which he complains altered the conditions of his employment and created an abusive working environment for him. The picture he paints based on his own knowledge is not one of a workplace permeated with racial abuse and hostility. To the contrary, Dieng has described a work environment where he perceived only minor instances of disparate treatment, at most he was subjected to inappropriate teasing based on his accent and no racial insults were personally directed at him,

he was not exposed to racial graffiti and he has not testified that he learned of graffiti of a racial nature second-hand, the vast majority of the incidents he complains about had no demonstrated connection to race, and he learned of only one racial slur through hearsay, following which the perpetrator was terminated, Dieng believes, because of the slur.

It follows that Dieng has not come forward with sufficient evidence to show that CCE is liable for co-worker harassment of him. Dieng relies on CCE's alleged knowledge of an overall hostile environment at CCE to support the imposition of employer liability, but there is no evidence that CCE stood by and allowed Dieng to be subjected to a course of racial harassment by his co-workers. Nor has plaintiff come forward with evidence to support the imposition of supervisory liability on CCE because he has not shown that supervisors at CCE created an actionable hostile environment for him.

## V. Conclusion

For all of the reasons set forth above, CCE's motion for summary judgment on the claims of plaintiff Dieng (doc. 167) is **GRANTED**. Dieng's claims against CCE are **DISMISSED** and Dieng is **DISMISSED** as a party to this lawsuit at his own cost.

**IT IS SO ORDERED**.

S/ Herman J. Weber
HERMAN J. WEBER, SENIOR JUDGE
UNITED STATES DISTRICT COURT