# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JEROME CHANCELLOR, et al.,

        Plaintiffs,

    v.                              Case No. C-1-08-65

COCA-COLA ENTERPRISES, INC.,

        Defendant.

## O R D E R

This matter is before the Court upon the Motion for Summary Judgment as to the Claims of Plaintiff Frank Hedges ("Hedges") filed by defendant Coca-Cola Enterprises, Inc. ("CCE") (doc. 61), plaintiffs' combined opposing memorandum (doc. 188), and CCE's reply in support of its motion (doc. 280). The parties have highlighted as true, false or irrelevant the opposing side's proposed findings of fact and conclusions of law filed in connection with its motion (docs. 199, 281).

## I. Allegations of the Complaint

Plaintiff Hedges is an employee of CCE who has worked in the warehouse at its Duck Creek Road facility in Cincinnati, Ohio, from February 1992 until the present time. Hedges filed this lawsuit against CCE under 42 U.S.C. § 1981 and the Ohio Civil Rights Act ("OCRA") on January 25, 2008. He claims that he has been subjected to a hostile work environment due to racial harassment throughout his approximately 16 years of employment at CCE. Specifically, plaintiff alleges that he has been subjected to the following incidents of harassment by co-workers and supervisors at CCE:

- On some unknown date, Hedges witnessed a Caucasian employee, Mike Brooks, pull down African-American employee Kavin Frierson's pants. Frierson, who has not worked at CCE since the late 1990's, also told Hedges that Brooks, who passed away in 1995, frequently called Frierson "nigger" and tormented him the entire time they were employed together, including by shrink-wrapping Frierson to a bench. Hedges 11/08 depo., p. 17.

- Some time possibly around 1995 or 1996, Hedges heard Supervisor Kevin Schroeder make a comment about kissing African-American employee Marcus Watson on his "big lips."

- In the mid to late 1990s, Jennifer Little, who has not worked at CCE since the early 2000's, told Tony Wallace to switch job assignments when another worker was readily available, but Hedges does not know why she did so. Also, five or more years ago, Caucasian co-workers Ray and Becky Webb were allowed to leave work early out of seniority order. Hedges 11/06 depo., pp. 40, 42-45.

- Some time before 2000, Hedges' supervisor, Jennifer Little, commented about a "do rag" he had tied around his head and said, "Oh, that looks cute, you remind me of the lady on the syrup bottle, you know, Aunt Jemima." Supervisor Chuck Peasley was walking by at the time, but when Hedges asked whether he had heard the comment, he just got red in the face and said nothing. When Hedges said, "that's not cool" to Little, she laughed and responded, "I just mean it's cute." Hedges 11/06 depo., pp. 32-34.

- Prior to installation of stainless steel walls, Hedges saw "nigger" and "KKK" written on the stalls in the men's restroom on the mezzanine level of the warehouse as well as graffiti that took "potshots" at coworker Tony Wallace. Hedges 11/06 depo., pp. 15, 20, 23, 25; Hedges 7/08 depo., p. 61.

- A long time ago, Hedges and co-plaintiff Richard Worthen were discussing the Los Angeles Lakers with African-American supervisor Lisa Brown when she said she did not like the fact that Kobe Bryant had a Caucasian wife. Hedges 7/08 depo., pp. 75-76.

- Employee Doug Stanley's vehicle had a bumper sticker with a Confederate flag on it and a caption reading, "If at first you don't succeed, try, try again."[1] Whether or not Hedges saw the sticker on a given work day depended on where he parked. He testified that he last saw it seven to eight months before his deposition. Hedges 11/06 depo., p. 26.

- In 2001 or 2002, co-worker Lonnie Waters "just said that he had racial problems with [Caucasian Supervisor] Carl North, and pretty much left it at that." Hedges 11/06 depo., pp. 37-38.

---

[1]According to Stanley, the bumper sticker read "If at first you don't secede . . ."

- A year to a year and a half prior to his deposition, either Tony Wallace or Richard Worthen told Hedges about a paper on a bulletin board "that was negative towards Blacks,' but the paper had been taken down by the time Hedges arrived for his shift. Hedges 11/06 depo., pp. 23-24.

- In 2004, Worthen showed Hedges a pamphlet titled "Ten Reasons Why Blacks Can't Be NASCAR Drivers."[2]  Hedges had heard that some of the pamphlets had been out at the back gate and had been passed around the facility.  Hedges 11/06 depo., pp. 27, 29.  CCE investigated but could not determine who was responsible.

- In 2003, when Hedges was on light duty at the back gate, a non-CCE truck driver told Hedges and some other employees who worked there that he was in an accident with an African-American female and he was going to run over this "nigger bitch."  Hedges 11/06 depo., pp. 15-16.  Hedges reported the incident to Lisa Brown, who asked the driver to leave the premises.  *Id*. at 16.  Hedges was told the driver was reported to his company.  *Id*. at 32.

- In 2006, Hedges' co-worker Donnie Brown, Jr. was telling him how to fix a fishing boat and told him that "whatever you do you don't want to nigger rig it."  Hedges 11/06 depo., p. 14.

- While Hedges and Worthen were on medical leave in 2007, Worthen told him that CCE had fired co-worker Tony Cruz after it learned that Cruz had sexually harassed and made a racial slur toward a female employee.  CCE fired Cruz on December 4, 2007.  Hedges 7/08 depo., pp. 42-43; Worthen 3rd depo., pp. 41-42.  Hedges had heard approximately four years earlier that Cruz had used a racial slur, but he does not know if anyone reported the incident.  Hedges 7/08 depo., pp. 43-44.

- In 2008, someone told Hedges that an unidentified individual had placed a noose on employee Calvin Ward's forklift.  Hedges 7/08 depo., pp. 63-65.  (Ward testified at his deposition that in 2004, someone placed a noose on his forklift and that co-worker Jay King, who saw the noose before Ward did, promptly removed it).  Ward depo., pp. 47-48; King depo., pp. 26-29, 30-32.

---

[2]The reasons listed were, in reverse order, as follows: "10) They have to sit upright 9) Pistols won't stay under the front seat 8) Rap music drowns out roar of the engines (or vice versa) 7) Police cars on the track interfere with the race 6) They keep trying to car-jack Dale Jr. 5) Pit Crew can't work on car and hold up their pants at the same time 4) No passenger seat for the 'HO' 3) There are no sponsors for Cadillac 2) Can't wear helmet sideways or backwards 1) When they crash the car they bail out and run.  And they do not hand out watermelons after the race."

- In 2008, co-worker Mike Paddy informed Hedges that a checker named Charlie Abdon had told another co-worker that if it were up to Abdon, he would shoot all black politicians. Hedges is not certain if Paddy actually heard the alleged comment. Hedges 7/08 depo., pp. 45-46, 49. Paddy denied that he heard the alleged comment or that he told Hedges about it.

## II. CCE's Motion for Summary Judgment

CCE argues that Hedges' suit is largely time-barred by the four-year statute of limitations applicable to claims brought under § 1981 (*see* 28 U.S.C. § 1658; *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)), and by the six-year statute of limitations applicable to claims brought under the OCRA. *See* Ohio Rev. Code § 2305.07; *Cosgrove v. Williamsburg of Cincinnati Mgmt. Co*., 70 Ohio St. 3d 281, 282, 638 N.E.2d 991, 992 (1994). According to CCE, the period of limitations for Hedges' § 1981 claim runs back to January 25, 2004, while the period of limitations for his state law claim runs back to January 25, 2002, so that incidents occurring prior to those dates are barred under federal and state law, respectively. CCE alleges that the following incidents that Hedges claims form part of a pattern of harassment therefore occurred outside the limitations period:

- The incident where Brooks, who is since deceased, pulled off Frierson's pants, which Hedges did not report.

- Brooks' calling Frierson "nigger" and shrink-wrapping him to a bench, which CCE claims is inadmissible hearsay in addition to being time-barred. *See Jacklyn v. Schering-Plough Healthcare Products Sales Corp*., 176 F.3d 921 (6th Cir. 1999); *Suits v. The Heil Company*, 192 Fed. Appx. 399 (6th Cir. 2006).

- Schroeder's "big lips" comment to Watson of 12 or 13 years ago.

- The instances of racial graffiti, which CCE alleges necessarily occurred before CCE installed stainless steel stalls in the warehouse mezzanine men's restroom in October 1999, although graffiti of any nature prior to that time was allegedly painted over and in 1999, Plant Manager Thomas Spohn distributed memoranda to all employees stressing that graffiti of any nature was prohibited.

4

- The "do-rag" comment by former supervisor Little in 2002.

- Brown's comment about Kobe Bryant's Caucasian wife by Brown, which plaintiff testified occurred "a long time ago."

- The 2003 racial slur by the non-CCE truck driver, which Brown promptly handled.

CCE alleges that the continuing violation doctrine does not save Hedges' claims from being time-barred because the links between the incidents he alleges are too attenuated to form one continuous act. Rather, CCE alleges that approximately five years passed between Schroeder and Little's alleged comments, Little has not worked for CCE within the limitations period, and Schroeder has not worked for CCE since 1999; at least five years passed between the Schroeder incident and the date Hedges heard co-worker Donnie Brown, Jr. make a racial comment; neither Watson, Frierson nor Brooks has worked for CCE since 1999; and CCE took intervening steps to remove and discourage racial graffiti.

CCE argues that even if the continuing violation theory were applied to Hedges' allegations dating back some 13 years, those allegations would be barred by the doctrine of laches. CCE contends that Hedges showed a lack of diligence by waiting so long to file a claim and CCE has been prejudiced as a result since witnesses have left its employment or, in at least one case, have passed away, and memories have faded.

CCE further argues that Hedges' allegations of second-hand harassment do not suffice to establish a hostile environment. CCE contends that federal and state case law preclude consideration of an allegation of second-hand harassment unless the claimant shows that (1) he learned of the harassment through his employment, (2) the allegations involve acts of harassment similar to those he alleges, (3) the harassment has a connection with his own work environment, (4) the alleged incidents are proximate in time, (5) the alleged incidents are similar in severity

5

and prevalence, and (6) the alleged incidents involve a common harasser who also targeted the plaintiff.  CCE contends that the following allegations of harassment that Hedges contends he learned of second-hand do not satisfy these requirements:

- Co-worker Waters' comment that he had experienced racial problems with North.  CCE claims that in addition to being time-barred and inadmissible hearsay, this allegation cannot be considered because Hedges did not learn of any specific conduct and cannot show any "connection" or "nexus" with his own work environment, Hedges cannot show that the alleged incident was reported to CCE, and even if otherwise admissible, the allegation would not be probative based on the lack of temporal proximity to other acts of alleged harassment, severity or prevalence, or the involvement of a common harasser between this act and other acts of alleged harassment.

- The paper on a bulletin board "that was negative toward blacks" which Worthen or Wallace told Hedges about.  CCE claims that in addition to being inadmissible hearsay, this allegation cannot be considered because (1) Hedges has minimal knowledge of the incident and cannot show any connection to his own work environment or that the matter was reported, and (2) neither Wallace nor Worthen testified about the alleged incident in their combined five depositions.

- The NASCAR poster.  CCE alleges that Hedges would never have known of the poster were if not for Worthen's efforts to show it to him, so he cannot show that the incident had any connection to his work environment.  CCE further notes that as soon as the matter was reported to it, it conducted an investigation but was unable to determine who was responsible.

- The relaying of the Tony Cruz firing.  CCE claims that Hedges cannot rely on this incident because Hedges learned of it from a co-plaintiff in this litigation rather than through his employment, he cannot show any connection with his work environment, particularly since he was on leave at the time, and CCE took appropriate action by discharging Cruz.

- The noose on co-worker Ward's forklift.  CCE contends that in addition to being inadmissible hearsay because Hedges cannot identify who told him of the incident, this incident cannot contribute to a hostile environment for Hedges because he first heard of the incident years after initiating this litigation and he cannot show that it had a connection to his own work environment.  Moreover, CCE contends that once it learned of the incident in 2007 through Ward's deposition, it investigated the matter but could not determine who was responsible.

- The Abdon remark about black politicians.  CCE contends that in addition to being inadmissible double hearsay, Hedges cannot rely on this allegation to establish a hostile

environment because he cannot show a connection to his work environment as the incident allegedly occurred on a different shift and in a different work area, the incident was not reported to CCE, and CCE investigated the matter once it learned of the allegation.

CCE contends that even if the evidence upon which Hedges bases his claim were admissible, Hedges would still be unable to establish a claim of hostile work environment racial harassment because the conduct he alleges does not meet the standard for such a claim. Specifically, CCE argues that Hedges cannot rely on the following incidents because they are not based on race:

- Little's directive to Tony Wallace to switch job assignments. CCE contends that in addition to being untimely, Hedges concedes that he can only speculate as to why Little gave this directive.

- The grant of permission to Ray and Becky Webb to leave work early out of order of seniority. CCE contends that not only is this allegation untimely if offered to support Hedges' § 1981 claim, but in addition the Webbs were purportedly favored over all other forklift drivers and not just African-Americans.

- Graffiti in the warehouse mezzanine men's restroom that took "potshots" at Wallace based on his work and personality.

CCE argues that even if these incidents are taken into consideration, Hedges cannot show that he experienced severe or pervasive harassment. CCE contends that according to Hedges, he has heard a racial comment less than once every 1,200 days of employment; three of the alleged incidents occurred outside the limitations period for both of his claims; a fourth occurred outside the limitations period for his § 1981 claim; one of the alleged incidents did not involve a CCE employee; only Little's alleged comment about his "do-rag" was directed at Hedges; Hedges does not allege that any of the racial graffiti was directed at him and he purportedly acknowledges that graffiti was promptly painted over; and Hedges only sporadically saw the Confederate flag bumper sticker on co-worker Doug Stanley's truck, he does not suggest that the

bumper sticker personally targeted him, after learning of the bumper sticker at Hedges'

deposition CCE interviewed Stanley about it and told him he could not have the sticker visible in

the parking lot, and since then it has not been visible.  Stanley depo., pp. 22-24.

CCE further contends that in any event, Hedges cannot establish a basis for employer

liability.  First, CCE contends that Hedges cannot establish employer liability for co-worker

harassment because in more than 16 years of employment, Hedges has never reported a single

concern to Human Resources at CCE and the only racial comment he reported was made by an

over-the road driver who worked for another company.  (FOF 26).  CCE contends that when it

has learned of an alleged incident through Hedges' deposition testimony, it has followed up with

the employees implicated to the extent they remain employed and has dealt with the incidents,

including by suspending Donnie Brown, Jr., for three days after he admittedly made the racial

comment that CCE learned of through Hedges' November 2006 deposition, and by promptly

painting over graffiti, installing an aluminum surface in the mezzanine level restroom to deter

graffiti in October 1999, and distributing a memorandum to employees that same year stressing

that graffiti was prohibited.

CCE contends that Hedges cannot establish a basis for employer liability for alleged

supervisor harassment because it maintains strong anti-harassment policies, it affords its

employees multiple avenues by which to bring any concerns to management's attention, and it

has trained its employees on its policies.  CCE alleges that over the course of 16 years of

employment, Hedges unreasonably failed to take advantage of the opportunities it provided to

avoid or correct harm.

### III.  Applicable Law

## A. Actionable Hostile Environment

Discrimination claims under the OCRA and § 1981 are generally governed by the same evidentiary standards as discrimination claims under Title VII. ***Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n,*** 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164, 1167 (1991); ***Singfield v. Akron Metro. Housing Auth.,*** 389 F.3d 555, 561 (6th Cir. 2004); ***Mitchell v. Toledo Hosp.,*** 964 F.2d 577, 582 (6th Cir. 1992). The Court will therefore look to both Title VII case law and Ohio law in order to resolve the motion for summary judgment on plaintiff's claims.

An employee may establish a violation of Title VII by proving that discrimination based on his membership in a protected group has created a hostile or abusive work environment. ***See Meritor Sav. Bank, FSB v. Vinson,*** 477 U.S. 57, 66 (1986). In order for racial harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" ***Id***. at 67. "The theory of a hostile-environment claim is that the cumulative effect of ongoing harassment is abusive." ***Hafford v. Seidner,*** 183 F.3d 506, 514-515 (6th Cir. 1999).

To establish a prima facie hostile environment case based on race under Title VII, the plaintiff must establish that (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his race, (4) the harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive, or intimidating work environment, and (5) there is employer liability. ***Id***. at 512.

To satisfy the fourth prong, plaintiff must show that the conduct to which he was subjected was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that he subjectively regarded the conduct as abusive. ***Smith v.***

*Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 658-59 (6th Cir. 1999)). In determining whether a reasonable person would consider an environment hostile or abusive, a court must consider the totality of the circumstances, including the frequency and severity of the conduct and whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. *Hafford,* 183 F.3d at 512.

A hostile environment claim "cannot be said to occur on any particular day." *Clay v. United Parcel Service, Inc*., 501 F.3d 695, 708 (6th Cir. 2007) (citing *Ledbetter v. Goodyear Tire & Rubber Co*., 550 U.S. 618 (2007) (quoting *Morgan*, 536 U.S. 101, 115-16 (2002)). Rather, a hostile work environment is comprised of "a succession of harassing acts, each of which 'may not be actionable on its own.'" *Id.* "[T]he actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Id*. Therefore, the court "should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." *Quanex*, 191 F.3d at 660 (citations omitted). On the other hand, a discrete act is not actionable as a hostile environment. *Clay*, 501 F.3d at 707-08.

Mere offensive utterances are not sufficient to create an actionable hostile environment. *Id*. However, the use of the word "nigger," even taken in isolation, is not a "mere offensive utterance." *Johnson v. United Parcel Service, Inc*. 117 Fed. Appx. 444, 454 (6th Cir. 2004). Moreover, "[a]n abundance of racial epithets and racially offensive graffiti" may constitute severe and pervasive harassment. *Quanex*, 191 F.3d at 662.

An action that is not explicitly racial in nature may constitute proof of a hostile work environment if it would not have occurred but for the plaintiff's race. *Id*.; *see also Williams v.*

*General Motors Corp*., 187 F.3d 553, 565-66 (6th Cir. 1999) (conduct underlying a sexual harassment claim need not be overtly sexual in nature.)  In *Williams*, the Sixth Circuit determined that "[t]he myriad instances in which [the plaintiff] was ostracized, when others were not, combined with the gender-specific epithets used, such as 'slut' and 'fucking women,'" were sufficient to create an inference that the plaintiff's gender was the motivation for her co-workers' conduct.  *Id*.

Discriminatory conduct and comments need not be directed at the plaintiff in order to contribute to a hostile environment.  *See Quanex*, 191 F.3d at 660 (citing *Black*, 104 F.3d at 826).  Rather, the plaintiff may be subjected to a hostile environment when the employer directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff himself.  *Id*.  The Sixth Circuit in *Quanex* explained that to consider harassment directed solely at the plaintiff in isolation from other acts that occur in the workplace would defeat the entire purpose of allowing claims based upon a hostile work environment theory because the "environment" means "[t]he surrounding conditions, influences or forces which influence or modify." *Id*. at 661 (quoting Black's Law Dictionary 534 (6th ed. 1990)).  The Sixth Circuit further explained that comments which disparage members of a protected class are relevant not only to whether a work environment was objectively hostile, but also to whether the plaintiff subjectively felt harassed.  *Id*.

Nonetheless, a plaintiff's knowledge of acts of harassment directed against other employees is not necessarily sufficient to establish a hostile work environment.  *Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 336 (6th Cir. 2008).  When the plaintiff alleges similar acts of past harassment against other employees, the factfinder may consider the following

factors in determining the relative weight to give the past acts: "the severity and prevalence of the similar acts of harassment, whether the similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff." *Id*. The proximity of the acts of harassment is to be weighed in accordance with the principle that the "further back in time the prior act occurred . . . the weaker the inference that the act bears a relationship to the current working environment." *Id*. at 337. When a "serial harasser" is involved, more weight should be given to the acts of harassment if the plaintiff knows that individual committed offending acts in the past since "a serial harasser left free to harass again leaves the impression that acts of harassment are tolerated at the workplace . . ." *Id*.

The trier-of-fact may credit evidence that a plaintiff learned second-hand that another employee in the protected group was harassed by a co-worker or supervisor. *See Quanex*, 191 F.3d at 660; *Wanchik v. Great Lakes Health Plan, Inc*., 6 Fed.Appx. 252, 261-262 (6th Cir. 2001). In order for incidents directed at other employees which occurred outside of the plaintiff's presence to be relevant to a plaintiff's own claim of harassment, the plaintiff must have become aware of those incidents during the course of his employment. *See Wanchik*, 6 Fed.Appx. at 261-262; *Hawkins*, 517 F.3d at 336.

## B. Employer Liability

Employer liability for co-worker harassment is based directly on the employer's conduct. *Hafford,* 183 F.3d at 513 (citing ***Pierce v. Commonwealth Life Ins. Co.,*** 40 F.3d 796, 804 n. 11 (6th Cir. 1994)). An employer is liable if it "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Id*. If the employer has developed a response to a complaint of co-worker harassment, the employer will be liable only "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." ***McCombs v. Meijer, Inc***., 395 F.3d 346, 353 (6th Cir. 2005) (citing ***Blankenship v. Parke Care Ctrs., Inc.***, 123 F.3d 868, 873 (6th Cir. 1997)).[3] In such a case, the employer's discriminatory act is not the harassment but is "the inappropriate response to the charges of harassment." *Id*.

The appropriateness of the employer's response depends on the frequency and the severity of the harassment. ***Blankenship***, 123 F.3d at 872. Generally, the employer's response is adequate if it is reasonably calculated to end the harassment. ***Jackson,*** 191 F.3d at 663 (citation

---

[3]***In Collette v. Stein-Mart, Inc***., 126 Fed.Appx. 678, 684 (6th Cir. 2005), the Sixth Circuit called the continued viability of ***Blankenship*** into question insofar as ***Blankenship*** held that "mere negligence as to the content of the response cannot be enough to make the employer liable. When an employer responds with good faith remedial action . . . it can be liable for [race] discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." The Sixth Circuit in ***Collette*** stated that an employer may be held liable when its remedial response is "merely negligent, however well-intentioned." *Id*. at 684, n. 3. More recently, however, in ***Mullins v. Goodyear Tire & Rubber Co***., 291 Fed. Appx. 744, 748 (6th Cir. 2008), the Sixth Circuit stated that its decision in ***Hawkins,*** 517 F.3d at 339, "removed any doubt that the ***Blankenship*** standard survives" and that ***Blankenship*** remains good law for the proposition that an employer may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

omitted). The employer's actions will not necessarily shield it from liability if the harassment continues. **Id**. at 665 (citation omitted).

It is not necessary that racially harassing conduct be reported to the employer in order for a cause of action to lie. **Id**. at 663. Rather, it is only necessary that the plaintiff establish that the employer "knew or should have known" of the harassing conduct. **Id**.

Employer liability for supervisor harassment is vicarious. **Hafford,** 183 F.3d at 513 (citing **Pierce**, 40 F.3d at 803). "An employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." **Id**. (citing **Faragher v. Boca Raton,** 524 U.S. 775, 807 (1998)). An employer may raise an affirmative defense to liability comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." **Id.** (quoting **Faragher,** 524 U.S. at 807). If the employer shows that an employee unreasonably failed to use any complaint procedure that the employer provided, such showing will ordinarily satisfy the employer's burden under the second element of the defense. **Faragher,** 524 U.S. at 808.

Under the first prong of the defense, employers "have an affirmative duty to prevent . . . harassment by supervisors." **Clark**, 400 F.3d at 349 (citing **Williams**, 187 F.3d at 561). "[A]n employer may not stand by and allow an employee to be subjected to a course of racial . . . harassment by co-workers or supervisors." **Id**. Rather, once an employer has learned of the harassment, the employer has a legal duty to take reasonable steps to eliminate it." **Id**. (citing

*Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997) (internal quotation marks and citations omitted)). Thus, regardless of whether the employee complained, the employer can be held vicariously liable if it was aware of the harassment but did nothing to correct it or prevent it from recurring. *Id*. (citing *Perry v. Harris Chernin, Inc*., 126 F.3d 1010, 1014 (7th Cir. 1997)).

While the affirmative duty on the part of the employer will often include the requirement that it have some type of anti-harassment policy in place, the law imposes a greater obligation than this on the employer. *Id*. The first prong of the affirmative defense requires the court to look beyond the face of the employer's policy to determine whether the policy "was effective in practice in reasonably preventing and correcting any harassing behavior." *Id*. (citing *Faragher*, 524 U.S. at 806).

## C. Statute of Limitations

The statute of limitations begins to run on the date a discriminatory act occurred. *See E.E.O.C. v. Penton Indus. Pub. Co., Inc*., 851 F.2d 835, 837-38 (6th Cir. 1988) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980); *United Airlines, Inc. v. Evans*, 431 U.S. 553, 557 (1977)). A discrete discriminatory act "occurred" on the day that it "happened." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). "[D]iscrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113. An employee is not barred, however, from using the prior acts as background evidence in support of a timely claim. *Id*.

Hostile environment claims are to be distinguished from discrete acts in that hostile environment claims by their nature involve repeated conduct and a single act of harassment may not be actionable on its own. *Id*. at 115. Where a hostile environment is alleged, "[t]he

'unlawful employment practice' cannot be said to occur on any particular day" but instead "occurs over a series of days or perhaps years." *Id*. In addressing the timely filing provision of Title VII for a hostile environment claim, the Supreme Court in ***Morgan*** held that so long as an act contributing to the hostile environment claim occurs within the filing period, the entire time period of the hostile environment may be considered for purposes of determining liability, even if some of the acts that make up the hostile work environment fall outside the statutory time period. *Id*. at 117. The Supreme Court stated that when deciding whether a charge is timely filed, the court's task is to determine whether the acts about which the employee complains form part of the same actionable hostile work environment and, if so, whether any act falls within the statutory time period. *Id*. at 120.

## D. Laches

A laches defense "bars a plaintiff from maintaining a suit if he unreasonably delays filing a suit and as a result harms the defendant." ***Morgan,*** 536 U.S. at 121. The defense "'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" ***Id.*** (citation omitted)

## E. Cases Where Conduct Held Not to be Sufficiently Severe or Pervasive

The question of whether conduct is severe and pervasive is "quintessentially a question of fact." ***Clay***, 501 F.3d at 707 (citing ***Jordan v. City of Cleveland***, 464 F.3d 584, 597 (6th Cir. 2006)). The Sixth Circuit has nonetheless affirmed grants of summary judgment and determined in a number of cases that the conduct complained of was not sufficiently severe or pervasive as a matter of law. In ***Clay***, the Sixth Circuit upheld the district court's determination that the harassment complained of by the plaintiff, which totaled 15 specific incidents over a two-year

period, "did not rise to the level of severity or pervasiveness that would unreasonably interfere with her ability to work." 501 F.3d at 707. The court of appeals found instead that the incidents were for the most part "mere offensive utterances," which are not actionable under Title VII. *Id*. (citing *Harris*, 510 U.S. at 21). The court compared *Jordan*, 464 F.3d at 598, where the court deemed sufficiently severe and pervasive a ten-year course of conduct consisting of racial slurs, demeaning jokes, inflammatory graffiti, isolation and segregation, disparate discipline, and the imposition of additional duties, with *Burnett*, 203 F.3d at 984-85, where the court determined that three sexually offensive remarks made by the plaintiff's supervisor at the beginning and end of a six-month period did not constitute pervasive discriminatory conduct. *Id*.

In a number of other cases, the Sixth Circuit has upheld determinations by the district court that the conduct alleged by the plaintiff did not rise to the level of "severe and pervasive." These cases include *Bowman v. Shawnee State Univ*., 220 F.3d 456 (6th Cir. 2000), in which the court held that three of five alleged incidents, though "not merely crude, offensive, and humiliating, but also contain[ing] an element of physical invasion" were not sufficient to meet the severe or pervasive standard; *Burnett v. Tyco Corp*., 203 F.3d 980, 985 (6th Cir. 2000), where the court held that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period [did] not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment;" *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000), where the court held that simple teasing, offhand comments, and isolated incidents, including a sexual advance, did not amount to discriminatory changes in the terms and conditions of the plaintiff's employment; *Dotson v. Norfolk Southern R.R. Co.*, 52 Fed.Appx. 655, 659 (6th Cir. 2002), where the court held that the following alleged conduct did not rise to the type regarded by the Sixth Circuit as

severe or hostile: a coworker persistently used the initials "KKK" instead of his own initials on work documents, which ceased once management was made aware the conduct; a coworker used the term "ungawa" from the Tarzan movies as a salutation, which the court found difficult to attribute to a racial motive; other coworkers called the plaintiff names such as "tar baby" and treated her harshly, which the court noted were allegations the plaintiff could support only in very general terms; management continued to use a janitorial service that employed a worker who allegedly harassed the plaintiff by mopping over her feet and bumping into her; and plaintiff alleged that she was subjected to disparate discipline, she was not allowed to sit at the front desk, and she was not promoted based on her race; *Leggett Wire,* 220 F.3d at 760, where the court held that "[r]acial animus [could not] be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at [the plaintiff], over a twenty-year span of time" and, specifically, that "a racial slur in 1974 by an unknown coworker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in [the plaintiff's] termination decision, [a coworker's] racist joke sometime after 1993, and [a] supervisor['s] reference to a black employee as a 'gorilla' [were] simply not 'severe or pervasive enough' to create an objectively hostile work environment."

Another case where the Sixth Circuit held that the plaintiff had failed to establish a hostile work environment is *Bourini v. Bridgestone/Firestone North American Tire, LLC*, 136 Fed.Appx. 747, 751 (6th Cir. 2005). In *Bourini*, the court distinguished *Quanex*, 191 F.3d at 662, and held that eight alleged incidents over a five-year period were insufficient to constitute discriminatory changes in the terms and conditions of employment. Rather, while several of the incidents were offensive and highly inappropriate, they were relatively infrequent and isolated and collectively did not arise to the "threatening" or "humiliating" level of severe conduct

required to create an objectively hostile or abusive work environment under Title VII. The alleged incidents were as follows: Within the first few months of his employment in 1998, a co-worker told Bourini, a Muslim from the country of Jordan, that he "did not want to go outside and see Bourini's camel tied to [his] wheels;" in 1999, another coworker called Bourini a "camel jockey;" approximately two years later, soon after the September 11 attacks, a coworker attempted to back over Bourini while reversing a forklift truck, although an investigation by the company disclosed no basis on which to conclude the coworker had acted intentionally or with a discriminatory animus; another coworker allegedly stated he would put Bourini in a box and send him back to his country and the next day allegedly told Bourini, "[I]f you'd get the sand out of your ears you'll hear me better;" in March 2002, an unknown coworker apparently mocked Bourini's voice over the intercom system; in June 2002, Bourini witnessed slurs painted on the wall of one of the plant's restroom stalls where someone had written that the "I" in "Islam" stood for "idiots," the "s" for "shit bags," the "1" for "losers," the "a" for "assholes," and the "m" for "morons;" in 2002, Bourini found a pamphlet at his work station entitled "For my Muslim Friend," which Bourini apparently assumed was Christian proselytizing material; and in February 2003, an e-mail message was distributed to all employees at the plant advising them that some of them needed to visit the human resources department to receive information about a change in federal immigration laws, which disturbed Bourini because he felt that the message should have been directed to him privately. *Id*. at 748-749.

The Sixth Circuit in **Kelly v. Senior Centers,** 169 Fed. Appx. 423 (6th Cir. 2006), likewise found that the plaintiff, a Caucasian who was employed at the defendant non-profit agency for seven months, had failed to establish a hostile work environment when he alleged that he heard two staff members refer to African-American foster grandparents as "niggers;" he heard

the Executive Director refer to an African-American member of the Board as a "token black" and comment that the foster grandparents were slovenly or "pigs" at meals; a staff member made three racist jokes; and the Executive Director refused to have the restrooms that were frequently used by the foster grandparents cleaned regularly and complained when an African-American staff member used the bathroom which was also used by the administrative staff.  In discounting the severity of the conduct, the court gave weight to the fact that none of these incidents involved any physical threat to plaintiff or the foster grandparents and none of the foster grandparents had ever heard, or been exposed to, any of the conduct.  The court concluded,

> While we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of [plaintiff] was not a daily or even a weekly event.

*Id*. at 429.  The court distinguished the case before it from *Quanex,* which it described as involving "evidence that supervisors routinely used the word 'nigger' and other racial slurs and gave out 'award' stickers for firing minority employees; workplace restrooms had graffiti stating 'KKK is back' and depicting lynchings; Caucasian workers falsely accused an African-American worker of stealing $300 in an attempt to get that worker fired; an African-American worker's shirt was defaced with the slur 'Nigger Sucker'; African-American workers were disproportionately disciplined by factory supervisors and were not promoted; and a Caucasian worker wore a swastika to work."  *Id*.  It also distinguished the case of *Hafford v. Seidner*, 183 F.3d 506, where evidence that the plaintiff, a prison guard, was called racially derogatory names by several coworkers over a two and a half-year period; repeatedly received anonymous and very threatening phone calls over the prison's internal telephone system, including one call stating "you're dead" and one using a slang phrase that referred to race-related lynching; was asked by his superior officer if "he was scared to die;" and was subjected to other derogatory comments

about being a "black Muslim," were sufficient to raise a jury question as to the existence of a racially discriminatory hostile work environment. *Id*. at 429-30. Finally, the Court distinguished ***Pollard v. DuPont de Nemours, Inc***., 412 F.3d 657, 659-664 (6th Cir. 2005), "where a relentless, daily, consistent pattern of sexual harassment, including refusal to accept supervision from the plaintiff female supervisor, daily use of sexual slurs, altering machines to make plaintiff's job more difficult, and intentional 'dirty tricks' such as slashing tires and burning plaintiff's food" were held to be sufficient to support a jury verdict of a hostile work environment. *Id*. at 430.

The court in ***Smith v. Glenny Glass Co., Inc.***, 2007 WL 1202713, **6-8 (S.D. Ohio April 20, 2007) (Dlott, J.) found that a total of seven instances of racially-oriented comments made by the president or other employees over an approximately five-year period, while "in incredibly poor taste and offensive," could not amount to severe or pervasive harassment under Sixth Circuit precedent. Rather, the court stated that precedent requires that an employee be subjected to more than sporadic, racially-charged comments, whereas the frequency of the discriminatory conduct alleged by the plaintiff before the court was sporadic, not routine. Specifically, the plaintiff alleged six discrete occasions on which a coworker or the company president made a racially offensive comment to him and he alleged that a coworker "consistently made racist statements concerning his gait;" there was no indication that any of the comments were made with hostility or suggested aggression or violence; and no comments involved the use of racial epithets. The court noted as examples of what is required for an employee to demonstrate a hostile or abusive work environment the incidents in ***Allen v. Mich. Dept. of Corrections***, 165 F.3d 405, 408-09 (6th Cir. 1999), where the plaintiff alleged he had been skipped over for promotions, he had received unwarranted disciplinary counseling notices, he

had been told by a manager that "he was lazy like the rest of his people and that is why they are all in prison," he had received a death threat signed "KKK" with a picture of a stick figure with a noose around its neck, and he had been transferred to an area where he could be watched closely after being told "niggers can't be trusted;"[4] the incidents in ***Moore v. Kuka Welding Sys***., 171 F.3d 1073 (6th Cir. 1999), where the plaintiff alleged he was subjected to a racially hostile work environment when he was subjected to frequent and numerous racial slurs and jokes, such as "hey nigger," and the supervisor failed to respond; someone wrote "kill all niggers" on the shop's bathroom wall and the supervisor failed to take action; a supervisor asked the plaintiff to drive a fellow employee, who was white, while the white employee sat in the back seat; and the plaintiff was subjected to more than a year's worth of supervisor-mandated, daily isolation from all other employees after he had filed a race discrimination complaint with the EEOC; and the incidents in ***Jordan v. City of Cleveland***, 464 F.3d 584 (6th Cir. 2006), where a city firefighter alleged being subjected to a plethora of racially offensive jokes and graffiti, derogatory comments, isolation, segregation, malicious pranks, disparate treatment, additional duties, and racially motivated transfers over a 15-year period.

**F.  Cases Where Conduct Held to be Sufficiently Severe and Pervasive**

In addition to those cases cited in ***Glenny Glass,*** there are several cases where the Sixth Circuit has found the alleged conduct to be severe and pervasive.  In ***Johnson,*** 117 Fed.Appx. at 454-455, the court found that the severity of the discriminatory conduct was high, an environment of management hostility towards African-Americans had altered the conditions of

---

[4]Additional allegations in ***Allen*** were a manager told Allen "I'm writing your black ass up" and the threatening letter signed "KKK" also stated "Pull bid-If not, you will be looking for a job or die. Nigger out."

employment, and the plaintiff's subjective feelings of hurt and loss of trust were objectively reasonable where the plaintiff heard second-hand that his Division Manager had made racial comments and was a racist; plaintiff had overheard the Division Manager use the word "nigger" in a conversation with the union business manager, who told plaintiff when he approached him that the Division Manager mocked the way the African-Americans talked and acted; the Division Manager told plaintiff that he was "tired of African Americans complaining" after plaintiff had filed a grievance; a supervisor accused plaintiff of falsifying records and stealing company time; plaintiff was aware of an incident where a white employee hit a black employee in the face with a package while making racial comments and the white employee was treated leniently by the company; a supervisor told plaintiff that an individual who was going to ride with plaintiff one day was going to "haul" plaintiff around all day; and a supervisor attempted to discipline plaintiff for wearing his prescription sunglasses indoors and approached plaintiff for taking too long for his deliveries, even though plaintiff was ahead of his schedule at the time. The factors that weighed into the court's decision were that the use of the word "'nigger,' even taken in isolation, is not a 'mere offensive utterance;'" the fact that the Division Manager was the one who allegedly uttered the slur "nigger" greatly increased its severity; the supervisor's accusation that plaintiff stole time was severe because, if true, it was grounds for immediate termination; and it was significant that the Division Manager, who was an integral figure in the grievance process, had directed the racially derogatory comment at plaintiff that he was tired of African Americans complaining in the context of responding to a grievance plaintiff had filed. *Id*.

In ***Austion v. Clarksville,*** 244 Fed. Appx. 639 (6th Cir. 2007), the plaintiff, an African-American officer with the Clarksville Police Department, was aware than another officer displayed racist cartoons on the briefing table at the Clarksville police station shortly after he

began his employment in 1991, although he did not personally view the cartoons; he learned from other African-American officers in the department that an unidentified officer had hung a noose in a workstation at police headquarters for at least four months in 2001; in September 2001, he was denied a promotion, despite having achieved a passing score on the written test, "because of his lethargic work ethic, lack of self motivation, low production, and deficient paperwork;" in March 2002, he was denied a promotion, as a result of which he filed a charge with the Equal Employment Opportunity Commission ("EEOC"); in January 2003, a request by Austion's supervisor that he receive a written commendation was delayed, apparently because of Austion's EEOC charge, and a letter was circulated by an officer describing employees who had filed discrimination charges as "complainers" and "disgruntled employees;" in May 2003, because of EEOC complaints, the Chief asked Austion to remove a figurine of a tribesman on a motorcycle from his desk because he thought it would offend minorities, but the Chief did not comment on a muscular Caucasian policeman with a dog figurine Austion had on his desk; the Chief ranted at Austion in front of his entire command staff when Austion approached him regarding rumors of an investigation concerning Austion's alleged involvement in drugs and prostitution; in October 2003, Austion's on-call schedule was changed to more difficult hours; in 2004, Austion was ordered to relinquish his weapon for testing to determine his possible involvement in a drive-by shooting at a house owned by a Caucasian officer; and Austion testified that supervisory officers used racial slurs throughout the department, and specifically, the Chief used the word "nigger" to describe African-Americans in the department in the late 1980s; in 2003, a Caucasian officer referred to a detective as a "nigger" and a supervisory officer called a detective a "nigger," after he arrived late at the shooting range. The court determined that Austion's 2001 and 2002 failure to promote claims were time-barred under Title VII but that

Auston nonetheless could rely on these past incidents to establish his hostile work environment claim. The court found that the collective import of all the racial incidents provided adequate evidence for the jury to infer that a racially hostile work environment existed. The court, while acknowledging that the evidence of hostile work environment harassment was "somewhat meager," nonetheless was not convinced that a reasonable jury could not find that a hostile work environment existed. *Id*. at 652.

*Quanex*,191 F.3d at 650, involved a manufacturing plant in Michigan that, in accordance with an agreement the company had signed with the EEOC, had increased the number of African-American employees in the plant to 18 out of 349 total employees. The plaintiff alleged that throughout her employment with Quanex, she was the victim of a racially hostile work environment resulting from "numerous racist incidents which [she] witnessed, experienced, and learned about from the small group of African Americans with whom she worked." The plaintiff personally experienced frequent racial slurs, including the word "nigger," and heard of graffiti reading "KKK is back" and depicting lynchings, regularly saw racist graffiti in the restroom and on a door in the plant that read "Blacks out back," had someone tamper with her equipment, was denied a helper for one year while similarly-situated employees were assigned a helper, and was disciplined and wrongfully denied overtime following an argument in which a co-worker called her a "nigger bitch." *Id*. at 651-52. The appellate court stated that an employer may create a hostile environment for an employee even when it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member rather than at just the plaintiff herself; the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment; and even if a certain action is not specifically racial in nature, it may contribute to a hostile work environment if it would not have

occurred but for the fact that the plaintiff was African-American. *Id*. at 661-62. The appellate court found that although Quanex occasionally responded to complaints of harassment, it was clear that "Quanex exhibited indifference rising to an attitude of permissiveness that amounted to discrimination." *Id*. at 666.

In ***Robinson v. CCE, Inc***., 2007 WL 2948869, **8-9 (S.D. Ohio Oct. 9, 2007), Judge Beckwith of this court followed *Quanex* and determined that a reasonable jury could find that under the totality of the circumstances, each of the five plaintiffs employed by CCE at its Duck Creek and Wilmer Avenue facilities during or around the same time period at issue in this case was subject to a racially hostile environment for the following reasons:

- The use of racial epithets by CCE employees was a common occurrence and the plaintiffs either personally experienced this abuse or learned of such insults from other employees.

- Employees' references to African-American employees as "niggers," "monkeys," and "gorillas" should be given considerable weight, even if the racial insults were infrequent, since these comments go beyond mere offensive utterances and are severe, malicious, and repugnant. 2007 WL 2948869, * 8 (citing *Johnson,* 117 Fed. Appx. at 454 and cases from other circuits).

- Plaintiff Robinson (1) was subjected to slurs on a daily basis; (2) was the victim of a racially-motivated assault by a Caucasian co-worker and witnessed the assailant punch another African-American employee; and (3) testified that African-American employees were held to different work standards and that supervisors allowed Caucasian employees to loaf while African-American employees were ordered back to work (*see Clay*, 501 F.3d 695) (plaintiff demonstrated that harassment was based on race where supervisor criticized plaintiff for conduct for which white co-workers were not criticized).

- Plaintiff McCoy (1) was the victim of racial slurs; (2) observed that supervisors treated African-American employees differently from Caucasian employees with respect to idling on the work floor; (3) was the victim of pranks perpetrated by his supervisor which a reasonable juror could find were racially motivated; (4) gave testimony which suggested that some work areas seemed to be segregated by race (*See Jordan*, 464 F.3d at 597 (plaintiff experienced racially hostile environment where work shifts were racially segregated in part); and (5) was aware of racial graffiti and heard that managers and supervisors used racial slurs in meetings.

- Plaintiff Roe (1) witnessed supervisors treat African-American employees and Caucasian

employees differently with respect to work assignments; (2) observed that African-American employees were disciplined more harshly than Caucasian employees with regard to rules infractions; (3) was aware of racial slurs made by a supervisor and heard about and personally observed racial graffiti, some of which remained on the walls for months; and (4) heard that a racially-motivated poster was displayed at the back gate.

- Plaintiff Frost (1) saw supervisors treat African-American and Caucasian employees differently with respect to idle time and disciplinary actions; (2) heard about racial graffiti in the restroom, although he knew it had been removed; (3) was aware of the altercation between Robinson and the Caucasian co-worker; (4) was aware of racial comments made by a white employee to another African-American employee; (5) was the victim of an apparently racially-motivated assault by a co-worker and the victim of a prank by the same co-worker which one could conclude was conceivably racially motivated; (6) was physically threatened by another co-worker; and (7) was subject to racially derogatory remarks by other employees, who among other things called him a "gorilla."

- Plaintiff Thiam (1) testified that supervisors treated African-American employees more rudely than Caucasian employees; (2) testified that his supervisor called him a "lazy black bastard" and made a comment about the complexion of his skin; (3) was aware of racist graffiti, including "nigger" and "KKK" on the bathroom walls; and (4) had heard that a supervisor threatened retaliation against another African-American employee for complaining about discrimination.

The court found that there was a question of fact as to whether CCE's anti-discrimination policies are effective and whether CCE had acted promptly to correct harassing behavior. In so concluding, the court relied on an April 26, 1999 memorandum which Kevin Johnson, Human Resources Manager for CCE's Duck Creek and Wilmer Avenue facilities, had written to Thomasina Kennedy, who was CCE's Human Resources Director at the time. The court determined that the memorandum reflected that CCE was aware of racial animus within its organization, "that it was having difficulty coming to grips with racism among its employees and supervisors," and that it had not responded adequately to the problem in the past. The court determined that the memorandum

demonstrates recognition by CCE that there was racial tension and disparate treatment of minority employees in its warehouse, supporting Plaintiffs' claims that they were forced to work in a racially hostile environment. Second, the

> memorandum implicitly recognizes that some of the supervisors about whom
> Plaintiffs now complain, specifically Carl North, Chuck Peasley, and Russ
> Lehman, were responsible for creating or contributing to the hostile work
> environment.

*Id*. at *11.

In addition, the court found that the plaintiffs had presented evidence that CCE's response to the harassment had been ineffectual; the mere existence of anti-discrimination policies did not conclusively establish that CCE had acted reasonably in remedying the harassment or preventing its recurrence; although CCE eventually took some steps to combat graffiti, such as laminating table tops and installing stainless steel bathroom stalls, a reasonable jury could find that these measures were slow in coming; and investigations into allegations of racial slurs simply resulted in denials by the accused employee with no further attempts by CCE to confirm or refute the charge *Id*. at **11-12. In response to CCE's argument that plaintiffs unreasonably failed to utilize the complaint procedures in place, the court found that plaintiffs had submitted ample evidence that the harassment was so severe and pervasive that CCE had constructive notice of it. *Id*. at *14.

### IV. Analysis of Hedges' Claims

For purposes of CCE's motion for summary judgment against Hedges, the Court must assume that none of the incidents that form the basis for his complaint are barred from consideration by the statute of limitations. For the reasons explained below, the incidents alleged by Hedges are sufficient to create a jury question as to whether he was subjected to a hostile work environment. Although certain acts that allegedly comprise the hostile environment occurred outside of the statutory limitations period, those acts may still be considered for purposes of determining CCE's liability so long as one of the acts that contributed to a hostile

environment occurred within the limitations period. Whether such an act occurred within the limitations period is a "quintessentially" factual determination which cannot be made on summary judgment in this case in light of the evidence plaintiff has presented. Accordingly, consistent with the Court's duty to draw all inferences in favor of plaintiff on summary judgment, the Court will not exclude any incident from consideration on summary judgment on the ground that it is time-barred.

Similarly, there are issues of fact as to whether plaintiff should be barred from maintaining this suit by the equitable laches defense. It is not clear to the Court at this stage of the proceedings why Hedges delayed filing this suit and whether CCE has been prejudiced by Hedges' delay in bringing this action. Resolution of these issues requires weighing of the evidence and the determination of factual issues, which are functions the Court cannot perform on summary judgment. Accordingly, the Court cannot make an informed judgment at this point as to whether Hedges should be barred from maintaining this suit by laches, but instead the Court must hear the evidence in order to determine whether CCE is entitled to this affirmative defense.

Turning to the merits of Hedges' claims, the Court finds that a reasonable jury could determine under the totality of the circumstances, viewed in the light most favorable to Hedges, that Hedges was subjected to a racially hostile work environment. Hedges testified that he was subjected to racial slurs and insults; he was exposed to racially-hostile graffiti; he learned of racially-hostile incidents involving other employees during the course of his employment; and supervisors treated Caucasian employees more favorably than African-American employees. The slurs included references to African-Americans as "niggers," a term which goes beyond a

mere offensive utterance and is considered "extremely severe" and "malicious, repugnant, repellant, and extremely hurtful to African-Americans." *See Robinson*, 2007 WL 2948869 * 8 (citing *Johnson v. United Parcel Serv., Inc*., 117 Fed. Appx. 444, 454 (6th Cir. 2004) and cases from other circuits.) CCE, as it did in *Robinson,* "attempts to downplay or minimize the severity of the environment [plaintiff was] exposed to by concentrating on the alleged infrequency of the conduct" or the fact that Hedges learned of racial graffiti and racial comments from other employees. *See Robinson*, 2007 WL 2948869 *7. As noted by the Court in *Robinson,* however, harassing comments and incidents that the plaintiff learned of second-hand may contribute to a hostile work environment and may be considered by the trier-of-fact. 2007 WL 2948869 *7 (citing *Quanex*, 191 F.3d at 661) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment); *Wanchik v. Great Lakes Health Plan, Inc*., 6 Fed. Appx. 252, 262 (6th Cir. 2001) ("crediting evidence that plaintiff heard rumors about co-workers harassing other women in assessing whether the work environment was hostile."))

The Court further finds that Hedges has come forward with sufficient evidence to create a jury question as to whether CCE knew or should have known of co-worker harassment which created an overall hostile environment at CCE's Duck Creek facility for Hedges and whether it failed to implement prompt and appropriate corrective action. The evidence produced by Hedges indicates that the plant had a history of racial incidents continuing throughout his employment and that CCE was aware of racial issues at the facility. Although CCE had non-discrimination policies in place, there are questions of fact as to whether CCE's policies were effective to prevent co-worker harassment and a hostile environment for Hedges and whether

CCE responded effectively to employees' complaints of violations of the policies. The April 26, 1999 Johnson memorandum introduced into evidence by Hedges and referenced in the ***Robinson*** litigation calls into question whether CCE's anti-discrimination policies were effective and whether CCE acted promptly to correct harassing behavior during the period of Hedges' employment for the reasons outlined in ***Robinson***, 2007 WL 2948869 *11.

Equally applicable to this case is Judge Beckwith's conclusion in ***Robinson*** that there is evidence that CCE's investigations into allegations of harassment were perfunctory, the investigations were halted after the alleged perpetrator flatly denied the accusation or after CCE was unable to identify the perpetrator, and the investigations generally resulted in no discipline being meted out. In addition, based on the evidence presented in this case, the Court agrees with Judge Beckwith's determination in ***Robinson*** that a reasonable juror could find that the measures CCE eventually took to deter racial graffiti were "slow in coming," CCE made no efforts to identify the perpetrators of the graffiti, and the problem was a recurring one despite employees' repeated reports and complaints. ***Id***. at **12-13. A reasonable jury could possibly conclude that CCE's response to complaints of harassment exhibited "indifference rising to an attitude of permissiveness that amounted to discrimination." ***See Quanex,*** 191 F.3d at 666.

In short, based on the evidence presented, there are questions of fact as to whether CCE had actual or constructive notice of co-worker racial harassment that rose to the level of an actionable hostile environment for Hedges and, if so, whether CCE failed to implement prompt and appropriate corrective action. Similarly, there are questions of fact as to whether CCE exercised reasonable care to prevent and correct promptly racially harassing behavior by Hedges' supervisors given evidence of CCE's long-standing knowledge of a racially hostile

environment in the plant, as well as questions of fact as to whether Hedges unreasonably failed to take advantage of corrective opportunities provided by CCE. These issues of fact preclude a grant of summary judgment in favor of CCE on Hedges' claims.

## V. Conclusion

For all of the reasons set forth above, CCE's motion for summary judgment on the claims of plaintiff Frank Hedges is **DENIED**.

**IT IS SO ORDERED**.

S/ Herman J. Weber
HERMAN J. WEBER, SENIOR JUDGE
 UNITED STATES DISTRICT COURT